## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

AMBER MOTKO,

      Plaintiff,

      v.

GEISINGER HEALTH PLAN,

      Defendant.

CIVIL ACTION NO. 3:24-CV-00732

(SAPORITO, J.)

## <u>MEMORANUM</u>

On April 29, 2024, the plaintiff, Amber Motko, initiated this action against Geisinger Health Plan ("Geisinger") by filing a complaint raising claims of discrimination, retaliation, and failure to accommodate under the Americans with Disabilities Act ("ADA") and the Pennsylvania Human Relations Act ("PHRA"), 42 P.S. § 951 *et seq.* (Doc. 1). On August 23, 2024, the plaintiff filed an amended complaint asserting those same claims. (Doc. 18). Now before the Court is Geisinger's motion for summary judgment. (Doc. 25). The motion has been briefed (Doc. 26; Doc. 27; Doc. 28; Doc. 29; Doc. 30) and the matter is ripe for review.

## I.    Background[1]

The plaintiff began working for Geisinger as a Case Manager Registered Nurse in March of 2018. The plaintiff's position was a full-time dayshift position, and she was expected to work forty (40) hours a week. While the plaintiff's position consisted of many job duties[2], one of the most essential duties was the maintenance of all required documentation for all case management activities. Registered nurses must document all information in Geisinger's computer systems after speaking to a member. This action is critical to Geisinger's compliance with the requirements of its Centers for Medicare and Medicaid Services contracts[3] so that all providers will have the most-up-to-date information about the patient. These contracts include the Special Needs Program

---

[1] The facts are taken from Geisinger's "Statement of Material Facts" (Doc. 26) and admitted by the plaintiff. (Doc. 29).

[2] Other duties included: (1) designing individualized plans of care by working collaboratively with the patient, primary care provider, and other members of the health care team to ensure coordination of services; (2) continuously evaluate lab results and tests while serving as a resource to the patient or member and healthcare team; and (3) collecting and utilizing data to adjust a patient's treatment plan when necessary.

[3] These contracts are those between Geisinger and the federal government, which sets forth specific requirements that Geisinger must follow in providing services to its Medicare and Medicaid healthcare plan members.

healthcare plan. Geisinger requires case manager registered nurses to document all relevant information for their patients within forty-eight (48) hours after contact with that patient. This standard is communicated to all case manager registered nurses during their orientation, subsequent training, and all performance reviews or performance discussions.

As a general rule, registered nurses were expected to ask other nurses to cover their shifts and perform their daily tasks if they required time off from work. All nurses were expected to help and cover for their coworkers. Before taking planned time off, case manager registered nurses were expected to ensure that they were up-to-date on long-term tasks so that the covering registered nurses only had to perform broader daily tasks, such as speaking to patients over the phone and properly documenting information from those phone conversations. If a registered nurse required time off and no one volunteered to cover his or her shift, another nurse would be assigned to cover that shift on a rotating schedule.

The plaintiff was supervised by regional manager David Augustine, who supervised approximately ten to twelve case manager registered

nurses in different clinics throughout Pennsylvania. While Mr. Augustine did not physically work in the same clinic as the plaintiff, he would often speak with her to monitor and resolve any issues that arose during her employment. Mr. Augustine would communicate with the plaintiff via cell phone, text message, or email throughout the workday. He interacted in the same capacity with all other registered nurses working throughout Pennsylvania.

Throughout her employment, the plaintiff faced various workplace performance issues that required monitoring by Geisinger. In 2021, the plaintiff failed to conduct a necessary Special Needs Program assessment for her job even though she was given notice of that assessment a month in advance. She had also previously failed to complete numerous Special Needs Program assessments by their deadlines in the past. Due to the plaintiff's history of missing deadlines, Mr. Augustine often personally reminded the plaintiff to complete her Special Needs Program assessments by the required date so much so that the plaintiff became accustomed to Mr. Augustine reaching out to her about deadlines for upcoming assignments.

By the end of 2021, because of the plaintiff's continuing struggles,

Mr. Augustine emailed the plaintiff to meet and address issues with her work performance, including her failure to complete her Special Needs Program assessments by the deadline, failure to complete her required number of daily calls and tasks, and her failure to follow up with patients for up to eight months about their medical history. At their meeting, Mr. Augustine informed the plaintiff that her work performance issues were concerning and that he was reaching out so they could come up with a better plan on how to handle those issues moving forward. In response, the plaintiff admitted to missing deadlines and acknowledged that she was behind on her required assessments, but she informed Mr. Augustine that she wanted to improve her work performance.

At the time of this meeting, the plaintiff alleged that she and Mr. Augustine had a good working and personal relationship, characterizing him as "understanding." Because of this relationship, the plaintiff confided in Mr. Augustine that she faced many difficulties in her personal life. The plaintiff told Mr. Augustine that she and her husband were having marital problems, and she was attending marriage counseling during her lunch breaks to help improve her marriage. She also expressed that her life was "falling apart at home," as she had late bills,

a disorganized and cluttered home, and she felt that she was unprepared for her children to start school. She told Mr. Augustine that she was failing as an employee, as a person, as a mother, and as a wife. During this conversation, the plaintiff also informed Mr. Augustine that she had been diagnosed with attention deficit disorder ("ADD") six months prior. She stated that she had begun taking a medication called Vyvanse to help with her diagnosis in addition to starting therapy. But the plaintiff also informed Mr. Augustine that she was quite capable of performing her job duties and that she was not going to leave her work to others when she could do it herself.

In February of 2022, Mr. Augustine received a report that the plaintiff submitted at least two of her Special Needs Program assignments after the deadlines. Geisinger contends that the plaintiff missed these deadlines despite her receiving at least three general reminding alerts from Geisinger and two separate direct reminders from Mr. Augustine. Moreover, Geisinger argues that the plaintiff had also failed to document patients' information in its systems on at least eight occasions, leading to Geisinger being written up by the Center for Medicare & Medicaid Services during one of its audits. After receiving

this report, Mr. Augustine subsequently met with the plaintiff for several hours to discuss the plaintiff's performance. During that review, when going through the plaintiff's employment history, Mr. Augustine details that neither he nor the plaintiff could identify a single instance where the plaintiff had met Geisinger's expectation that she call at least eight patients daily and document their information. Mr. Augustine contends that he again asked the plaintiff if she required any assistance performing her job duties. The plaintiff denied that she needed any assistance. Thereafter, Mr. Augustine sent the plaintiff an email four days later detailing instances of her insufficient, untimely, and missing documentation and asked that the plaintiff update the patients' records with any necessary information.

Despite her interactions with Mr. Augustine, the plaintiff continued to struggle in her position as she consistently failed to submit required documents and meet Geisinger's standards for patient touches and new enrollments throughout 2022. As a response to the plaintiff's workplace performance, Mr. Augustine contacted the plaintiff on March 3, 2022, and offered to have nurse educator Tammy Pittsman meet with her during the workday to determine whether the plaintiff needed assistance to

complete her daily goals. Ms. Pittsman performed the orientation training for the new case manager registered nurses and if needed, offered additional training and education to those registered nurses. The plaintiff accepted Mr. Augustine's offer, and on March 14, 2022, she met with Ms. Pittsman. The plaintiff was given tips, training, and assistance to help her improve her workplace performance.

At that time, the plaintiff had a personal notebook full of outstanding patient notes for approximately forty-five patients. Due to those unfinished notes, Ms. Pittsman, Mr. Augustine, and the plaintiff agreed on an action plan to help the plaintiff complete her overdue documentation. The plaintiff agreed to spend the last hour of each workday charting the overdue documents in her personal notebook and promised to arrive early to work to complete that documentation. Despite that action plan, the plaintiff failed to make any significant progress with her documentation. She repeatedly submitted required documentation late and, at times, failed to submit it altogether. The plaintiff explained that she failed to do so because she was busy with her children and her cleaning business.

On March 23, 2022, as the first step in Geisinger's discipline

process, the plaintiff received a verbal warning for her work performance. The plaintiff's warning provided her with the specific dates and instances in which she failed to submit her required documentation and failed to meet Geisinger's overall expectations. The warning also detailed the plaintiff's failure to meet Geisinger's standard for daily patient touches in addition to the plaintiff's persistent problem in writing patient notes in her own personal notebook rather than in Geisinger's systems. Although she had the ability to do so, the plaintiff chose not to submit any comments or questions in response to her verbal warning.

On May 23, 2022, Mr. Augustine held a Teams meeting with the plaintiff to help her improve her work performance. Mr. Augustine provided the plaintiff with recommendations on how to document patients in real time while teaching her different ways to submit her documents so that the plaintiff could better meet Geisinger's expectations. Nonetheless, on June 17, 2022, the plaintiff received a written warning as part of the second step in Geisinger's discipline process for her continued failure to meet Geisinger's expectations of submitting documentation. The plaintiff's warning again provided her with the specific dates and instances that she failed to submit her

required documentation and meet Geisinger's overall expectations. Mr. Augustine again offered to have another case manager registered nurse cover the plaintiff's shift so that the plaintiff could focus on completing her overdue documentation. The plaintiff declined Mr. Augustine's offer.

In response, Mr. Augustine met with the plaintiff not only to discuss her repeated failure to submit her requirement documentation, but also to address her failure to arrive to work on time. Geisinger's policies require case manager registered nurses to report to work on time and notify their supervisor if they are going to be late for any reason, including reasons related to work. Generally, Geisinger case manager registered nurses began work at 8:00 a.m. to input required documents and call their assigned patients before many of those patients begin their days. Mr. Augustine, however, allowed the plaintiff to begin working a few minutes after 9:00 a.m. during the school year so that she could drop her children off at school or at their bus stop. Despite Mr. Augustine's accommodations, the plaintiff consistently arrived to work after 9:00 a.m. On June 17, 2022, the plaintiff reported to work at 10:15 a.m., failing to notify Mr. Augustine that she was going to be late for work that day. On at least two other occasions, the plaintiff arrived at work at

approximately 10:45 a.m. without notifying Mr. Augustine. In response, Mr. Augustine met with the plaintiff and reiterated to her that it was exceptionally important for her to let him know when she was going to be late for work in the future, even for work-related reasons.

Later that year, in response to the plaintiff's continuing struggles, Mr. Augustine cancelled one of the plaintiff's training sessions and rescheduled it for September of 2022. The cancellation eliminated approximately sixteen hours of training to give the plaintiff additional time to clean up her calendar and complete her overdue documentation.

On September 23, 2022, after consistently failing to meet Geisinger's expectations to timely submit requirement documentation, Mr. Augustine issued the plaintiff a suspension as the next step in the discipline process. The suspension provided the plaintiff specific dates and instances that she failed to submit requirement documentation and included an action plan to improve the plaintiff's performance. The plaintiff's action plan included completing all overdue charting by the end of September of 2022. The plaintiff, however, failed to complete these assignments.

By May 2022, the clinic consistently advised Mr. Augustine that the

plaintiff was frequently absent from her job when she was needed to discuss her assigned patients, particularly in the morning hours. On May 31, 2022, after investigating the plaintiff's arrival times, Mr. Augustine confirmed the clinic's concerns as he checked the plaintiff's work computer and saw no record of her logging into that computer at all the previous Wednesday or Friday. That same day, the plaintiff was observed arriving at work at 11:30 a.m. and leaving at 2:00 p.m. for lunch. Moreover, the plaintiff was observed arriving at work around 10:30 a.m. the following day. The clinic again notified Mr. Augustine that the plaintiff's tardiness was becoming a daily issue. Indeed, in November of 2022, one of the plaintiff's assigned members asked her pharmacist if she could get a new case manager registered nurse because she could never contact the plaintiff.

In total, the plaintiff swiped her badge and arrived at her clinic for the first time after 9:10 a.m. on the following occasions:

a. Three (3) times in March 2021;

b. Ten (10 times in April 2021;

c. Five (5) times in May 2021;

d. Thirteen (13) times in June 2021;

e.  Ten (10) times in July 2021;

f.  Fifteen (15) times in August 2021;

g.  Fourteen (14) times in September 2021;

h.  Eleven (11) times in October 2021;

i.  Seventeen (17) times in November 2021;

j.  Fifteen (15) times in December 2021;

k.  Four (4) times in January 2022;

l.  Fifteen (15) times in February 2022;

m. Eleven (11) times in March 2022;

n.  Twelve (12) times in April 2022;

o.  Fourteen (14) times in May 2022;

p.  Sixteen (16) times in June 2022;

q.  Four (4) times in July 2022;

r.  Eighteen (18) times in August 2022;[4]

s.  Eight (8) times in September 2022;

t.  Six (6) times in October 2022;

u.  Fourteen (14) times in November 2022; and

---

[4] Geisinger states, and the plaintiff confirms, that the work log shows that the plaintiff failed to arrive for work on time a single day in the month of August of 2022.

v. Fourteen (14) times in December 2022.

The plaintiff cannot confirm where she was before her first badge swipe any day between March of 2021 and January 5, 2023.[5]

On January 6, 2023, Mr. Augustine and Jennifer Remetta, Geisinger's Director of Care Coordination and Integration, arrived at the plaintiff's clinic to inform her that she was being terminated due to her consistent failure to adequately perform her job duties. The plaintiff, however, was still at home and had failed to inform Mr. Augustine that she would be late to work on that date. At approximately 10:00 a.m., Mr. Augustine called the plaintiff and asked if she was coming to work that day. The plaintiff responded that she would come to work as soon as possible and subsequently arrived at the clinic fifteen minutes after her conversation with Mr. Augustine. The plaintiff was then informed that she was terminated from her employment with Geisinger for her

---

[5] Geisinger notes two further reasonings for the plaintiff's termination. The plaintiff created social media content at work that was unrelated to her job duties and on at least three occasions, the plaintiff made TikTok videos at work just for fun. Moreover, the plaintiff would discuss her cleaning business with a fellow employee while at work, which resulted in the clinic receiving many complaints that she was working on her cleaning company schedules during working hours.

continued performance issues.

Beyond the plaintiff's failure to complete her job duties, Geisinger also cites the plaintiff's poor attendance as reasons for her termination. As early as February 2022, Geisinger received complaints that the plaintiff was never at work when she was supposed to be speaking to her patients. The first documented complaint was received on February 10, 2022, when the plaintiff arrived to work shortly before 11:00 a.m. and left the clinic between 12:45 p.m. and 2:45 p.m. without explanation. The clinic reported this incident to Mr. Augustine and advised him that it had voiced prior concerns about the plaintiff's poor attendance and tardiness.

## II.    Legal Standard

Rule 56 of the Federal Rules of Civil Procedure dictates summary judgment should only be granted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is "genuine" only if the evidence "is such that a reasonable jury could return a verdict for the non-moving party." *Id.* at 248. In deciding a summary judgment motion, all inferences "should be

drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Pastore v. Bell Tel. Co. of Pa.*, 24 F.3d 508, 512 (3d Cir. 1994).

Parties seeking summary judgment bear "the initial responsibility of informing the district court of the basis for its motion," and demonstrating the absence of a genuine dispute of material fact. *Celotext Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant makes such a showing, the non-movant must set forth specific facts, supported by the record, demonstrating that "the evidence presents a sufficient disagreement to require submission to the jury." *Anderson*, 477 U.S. at 251–52. A court must first determine if the moving party has made *prima facie* showing that it is entitled to summary judgment when evaluating such a motion. *See* Fed. R. Civ. P. 56(a); *Celotex*, 477 U.S. at 331. Only once that *prima facie* showing has been made does the burden shift to the nonmoving party to demonstrate the existence of a genuine dispute of material fact. *See* Fed. R. Civ. P. 56(a); *Celotex*, 477 U.S. at 331.

Parties may cite to "particular parts of materials in the record, including depositions, documents, electronically stored information,

affidavits or declarations, stipulations (including those made for the purposes of the motion only), admissions, interrogatory answers or other materials." Fed. R. Civ. P. 56(c)(1)(A). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). "Although evidence may be considered in a form which is inadmissible at trial, the content of the evidence must be capable of admission at trial." *Bender v. Norfolk S. Corp.*, 994 F. Supp. 2d 593, 599 (M.D. Pa. 2014); *see also Pamintuan v. Nanticoke Mem'l Hosp.*, 192 F.3d 378, 387 n.13 (3d Cir. 1999) (noting that it is not proper, on summary judgment, to consider evidence that is not admissible at trial).

## III.  Discussion

The plaintiff has alleged claims of discrimination, retaliation, and failure to accommodate under the ADA and the PHRA. Claims under the ADA and the PHRA are analyzed under the same burden-shifting framework set forth in *McDonell Douglas Corp v. Green*, 411 U.S. (1973). *See generally Salley v. Circuit City Stores, Inc.*, 160 F.3d 977, 979 n.1 (3d Cir. 1998) ("[A] claim under the PHRA is coextensive with a claim under

the ADA."); *Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996) (noting that "Pennsylvania courts … generally interpret the PHRA in accord with its federal counterparts"). This framework applies to both claims of discrimination and retaliation. *See Fowler v. AT&T, Inc.*, 19 F.4th 292, 298 (3d Cir. 2021) (discrimination); *Shaner v. Synthes*, 204 F.3d 494, 500 (3d Cir. 2000) (retaliation). As summarized by the Supreme Court, under *McDonnell Douglas*:

> [A] plaintiff must first establish a prima facie case of discrimination. The burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its employment action. If the employer meets this burden, the presumption of intentional discrimination disappears, but the plaintiff can still prove disparate treatment by, for instance, offering evidence demonstrating that the employer's explanation is pretextual.

*Raytheon Co. v. Hernandez*, 540 U.S. 44, 49 n.3 (2003) (citations omitted).

## A. Plaintiff's Discrimination Claims

Under the first step of *McDonnell Douglas*, to establish a prima facie case of discrimination under the ADA and the PHRA, a plaintiff must establish that: (1) he was disabled; (2) he was otherwise qualified for the position at issue, with or without reasonable accommodation; (3) he was subject to an adverse employment action; and (4) the adverse

employment action was because of his disability. *See Fowler*, 19 F.4th at 299; *Sulima v. Tobyhanna Army Depot*, 602 F.3d 177, 185 (3d Cir. 2010). Here, Geisinger moves for summary judgment contesting the first, second, and fourth elements by arguing that the plaintiff has failed to establish that she was disabled, that she was qualified for her position, and that her termination was connected to her disability.[6]

Under the first element, the ADA defines a "disability" as "(1) a physical or mental impairment that substantially limits one or more major life activities of such individual; (2) a record of such impairment; or (3) being regarded as having such an impairment." 42 U.S.C. § 12102(1). A plaintiff is disabled within the meaning of the ADA only if she had a disability at the time of the adverse employment decision. *Rahsman v. Dewberry-Goodkind, Inc.*, No. 1:05-CV-1931, 2007 WL 188571, at *6 (M.D. Pa. Jan. 22, 2007). Here, the plaintiff contends that her attention-deficit disorder ("ADD") diagnosis meets the definition of a

---

[6] There is no dispute that the plaintiff's termination constitutes an adverse employment action, as adverse employment actions include "all tangible employment actions 'such as hiring, *firing*, failing to promote, reassignment or a decision causing significant change in benefits.'" *Sherrod v. Philadelphia Gas Works*, 57 F. App'x. 68, 73 (3d Cir. 2003) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)) (emphasis added).

"disability" because it constitutes a physical or mental impairment that substantially limits a major life activity. In response, Geisinger argues that the plaintiff has failed to show that her ADD diagnosis affected any major life activities.

While an ADD (or ADHD) diagnosis can serve as a "disability" under the ADA, *see Gibbs v. City of Pittsburgh*, 989 F.3d 226, 229 (3d Cir. 2021), the Third Circuit has held that a diagnosis alone is insufficient to establish an ADA disability. *Tice v. Centre Area Transp. Auth.*, 247 F.3d 506, 513 n. 5 (3d Cir. 2001). "Rather, the inquiry as to disability is to be made on a case-by-case basis." *Id.* Here, the plaintiff argues that her ADD diagnosis substantially limited her ability to "focus[] on one thing" and made it difficult to "switch[] to another task." (Doc. 28, at 12) ("Plaintiff informed Mr. Augustine that she struggled with prioritizing and that she becomes hyper focused."). The plaintiff's limitations, however, are not enough to serve as a substantial limit to a major life activity.

There is no doubt that concentrating and thinking are major life activities. *See, e.g., Gagliardo v. Connaught Labs., Inc.*, 311 F.3d 565, 569 (3d Cir. 2002) (concentrating); *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 307 (3d Cir. 1999) (thinking). But there is nothing in the record that

indicates that the plaintiff is substantially impaired, rather than slightly or moderately impaired, in her ability to think or concentrate as a symptom of his ADD diagnosis. *Collins v. Prudential Inv. & Ret. Servs.*, 119 F. App'x 371, 376 (3d Cir. 2005) ("We do not intend to be uncharitable in noting that [the plaintiff] describes difficulties that many people who are not suffering from ADHD/ADD must regularly cope with … [but] [a]t most, the impact on thinking, learning, concentrating and remembering can be accurately characterized as moderate."); *Warshaw v. Concentra Health Servs.*, 719 F. Supp. 2d 484, 495 (E.D. Pa. 2010) ("As for [plaintiff's] remaining difficulties–in multitasking, maintaining attention and focus, and pacing his work–although plaintiff is limited to some degree in these areas, there is no indication that these limitations are substantial or severe."); *see Dlugos v. Eastman Kodak Co.*, No. 95-1525, 1996 WL 679411, at *5 (W.D. Pa. Sept. 5, 1996) (rejecting the notion that a plaintiff's concentration was seriously impaired because, as a result of his condition, "[a]n extra effort was required to concentrate, particularly on detailed paperwork"). Indeed, the plaintiff conveyed to Geisinger numerous times that her diagnosis did not impact her work productivity. (Doc. 26, ¶ 101) ("Plaintiff specifically told Mr. Augustine

that she was recently diagnosed with ADD and she was still doing everything she was doing before…"); (*Id.*, ¶¶ 106, 107) (confirming in writing that she was capable of doing her job duties); (*Id.*, ¶ 175) ("Even after advising Mr. Augustine that she had been diagnosed with ADD, Plaintiff confirmed to Mr. Augustine that she did not require any type of accommodation to perform her job duties."). Her admissions run counter to her allegations that her major life activities were substantially limited. *See Warshaw*, 719 F. Supp. 2d at 495 (finding that the plaintiff's admission that his ADHD diagnosis did not affect any "day-to-day activities" provided "no evidence from which a reasonable fact-finder could determine that plaintiff is substantially limited…"). Therefore, the plaintiff's ADD diagnosis in this action does not fall under the definition of "disability" for her discrimination claim under the ADA.

The plaintiff also argues, however, that her ADD diagnosis qualifies as a "disability" under the ADA because Geisinger regarded her as having such an impairment. A person is regarded as disabled when "the employer either 'mistakenly believed that the employee has a physical [or mental] impairment that substantially limits one or more major life activities' or 'mistakenly believed that an actual non-limiting impairment

substantially limits one or more major life activities.'" *Sulima*, 602 F. 3d at 188; *see also* 42 U.S.C. § 12102(3)(A). Here, a genuine dispute of material fact remains as to whether Mr. Augustine perceived the plaintiff as having an impairment due to her ADD diagnosis. There is no dispute that on August 20, 2021, the plaintiff shared with Mr. Augustine through email that she had been diagnosed with ADD in the last six months, and therefore, Mr. Augustine would have had knowledge about that diagnosis at the time of the underlying events. (Doc. 26, ¶¶ 98, 99). In response, Geisinger notes that "the mere fact that an employer is aware of an employee's impairment is insufficient to demonstrate that the employer regarded the employee as disabled or that the perception caused the adverse employment action." *Kelly*, 94. F.3d at 109. But the record shows that not only was Mr. Augustine aware of the diagnosis, but he also consistently accommodated, or tried to accommodate, the plaintiff due to her work performance struggles potentially due to her ADD. (Doc. 26, ¶ 111) ("[Mr. Augustine] regularly asked [plaintiff] whether she required any assistance in the workplace."); (*Id.*, ¶ 123) ("Mr. Augustine contacted Plaintiff and offered to have Nurse Educator Tammy Pittsman sit with her during a workday to see if there was anything Ms. Pittsman could do

to help Plaintiff complete her daily goals."); (*Id.*, ¶ 160) ("Mr. Augustine also cancelled a training that Plaintiff was scheduled to attend and rescheduled the training for September 2022."). Therefore, a reasonable factfinder could conclude that Mr. Augustine perceived the plaintiff as having a disability due in part to his awareness of her diagnosis and his attempts to accommodate her throughout her employment.

Having established that the plaintiff survives the first element of her prima facie discrimination case, we turn to Geisinger's argument that the plaintiff has failed to show under the second element that she was otherwise qualified for her position. We also find, however, that there is a genuine dispute of material fact as to this prong that prevents the granting of summary judgment. It is undisputed that one of the essential duties of the case manager registered nurse position concerns the required documentation for all case management activities, (Doc. 26, ¶ 37), and a review of the record supports the assertion that the plaintiff struggled with this area of her workplace performance. (*Id.*, ¶¶ 64–184). Indeed, the plaintiff admits as much. *See* (*Id.*, ¶ 88) ("Plaintiff admitted to missing these deadlines and acknowledged that she was behind on her required SNP assessments"); (*Id.*, ¶ 134) ("Plaintiff informed Mr.

Augustine that she was not able to complete as much back charting as she hoped….”). But the job duties of a case manager registered nurse at Geisinger include more than just the maintenance of all requirement documents for case management activities. *See* (*Id.*, ¶ 36) (listing other duties such as “integrating clinical guidelines; developing systems of care; assisting with the design, implementation, and evaluation of the advanced patient center care model…”). Indeed, the record before us is limited to only one aspect of the plaintiff’s job duties, the maintenance of requirement documents, rather than speaking on the qualifications of all functions of the plaintiff’s job. Thus, viewing the evidence in favor of the non-moving plaintiff, the incomplete record creates a dispute of material fact as to the plaintiff’s qualifications for the entirety of the duties of her job. Moreover, the plaintiff has identified past favorable performance reviews in which Mr. Augustine referred to her as a “valued contributor” in the workplace. (Doc. 28-1, ¶¶ 5,7,10). Therefore, the determination of whether the plaintiff was qualified for her position is better left to a jury as there remains a genuine dispute of material fact as to those qualifications.

Nonetheless, Geisinger contends that even if the plaintiff has

satisfied the first three elements of *McDonnell Douglas*, the plaintiff has still failed to show that the plaintiff's termination related to her disability as required under the fourth element. *See Emmell v. Phoenixville Hosp. Co. LLC*, 303 F. Supp. 3d 314, 332 (E.D. Pa. 2018) ("Causation is required for both discrimination and retaliation claims under the ADA."). "There are two ways to establish a causal connection under the ADA: (1) where the temporal proximity of the alleged disability and the adverse employment action are 'unduly suggestive,' no other evidence is required; or (2) where the timing is not 'unusually suggestive,' but there is other evidence of discrimination or a 'pattern of antagonism.'" *Quick v. GEO Grp., Inc.*, No. 3:18-CV-93, 2020 WL 532343, at *17 (W.D. Pa. Feb. 3, 2020) (citing *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 503–04 (3d Cir. 1997)). Here, the plaintiff does not argue that the temporal proximity of her ADD diagnosis and her termination are "unduly suggestive," but rather contends that the evidence in the record directly shows a causal connection.

The plaintiff testified that Mr. Augustine would make discriminatory comments about her ADD, such as:

> He didn't know how my brain worked, didn't know how to address things knowing that my brain works

> differently. "ADHD brain." Or if he would send me a
> message that we have to, like, Hey, can you jump on a
> call later, it would be, No, don't get anxious, don't want
> your ADHD to get out of control…. No he would say, I
> don't know how to help you with the way your brain
> works or your ADHD brain.

(Doc. 28-1, ¶ 33). The plaintiff's testimony indicates that at a minimum, Mr. Augustine perceived the plaintiff's ADD diagnosis as a negative and contributing factor in her overall workplace performance. We find that based on this premise, a reasonable factfinder could conclude that the plaintiff's termination stemmed from Geisinger's perception of the negative implications of the plaintiff's disability. Geisinger argues otherwise, contending that the record unequivocally shows that the plaintiff's termination was based on her workplace performance rather than her disability. But Geisinger's assertion merely creates a genuine dispute of material fact as to the cause of the plaintiff's termination, and as we have indicated above, these types of disputes are better left to the jury. Therefore, the plaintiff has provided enough evidence under step one of *McDonell Douglas* to survive Geisinger's motion for summary judgment.

But the plaintiff must also show evidence of pretext for her termination as required under the third step in *McDonell Douglas* to

survive summary judgment. The third step of the *McDonell Douglas*

framework requires a plaintiff to:

> identify[] evidence from which a factfinder could
> reasonably either (1) disbelieve the employer's
> articulated legitimate reasons; or (2) believe that an
> invidious discriminatory reason was more likely than
> not a motivating or determinative cause of the
> employer's action. A plaintiff must do more than simply
> claim a decision was wrong or mistaken to discredit a
> proffered justification. The plaintiff must demonstrate
> such weaknesses, implausibilities, inconsistencies,
> incoherencies, or contradictions in [the employer's]
> proffered legitimate reasons for its action that a
> reasonable factfinder could rationally find them
> unworthy of credence, and hence infer that the employer
> did not act for the asserted non-discriminatory reasons.

*Duran v. Cnty. of Clinton*, 380 F. Supp. 3d 440, 452 (M.D. Pa. 2019)

(citations, internal quotation marks, and brackets omitted). Here,

Geisinger proffers that it terminated the plaintiff due to her workplace

performance, citing the plaintiff's failure to complete her necessary tasks

and her tardiness from work, among other issues, as justification for that

action. The plaintiff therefore bears the burden to demonstrate "such

weaknesses, implausibilities, inconsistencies, incoherencies, or

contradictions in [the employer's] proffered legitimate reasons for its

action that a reasonable factfinder could rationally find them unworthy

of credence." *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294,

310 (3d Cir. 2012) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)). We find that she has done so here.

We note again the plaintiff's testimony that Mr. Augustine consistently made discriminatory comments about her ADD. *See* (Doc. 18-1, ¶ 33). As we did above, we find that a reasonable factfinder could conclude, based on Mr. Augustine's comments, that the plaintiff's ADD diagnosis served as the underlying justification for her termination. In doing so, we acknowledge that Geisinger identifies multiple instances in the record that it argues demonstrates that the plaintiff was terminated for failure to perform her essential job duties. But this determination is one for the factfinder and therefore must be decided by a jury. For these reasons, Geisinger's motion for summary judgment concerning the plaintiff's discrimination claim will be denied.

### B. Plaintiff's Retaliation Claims

The plaintiff's retaliation claims are analyzed under the same *McDonnell Douglas* framework as her discrimination claims. *Shaner*, 204 F.3d at 500. To establish a prima facie case of retaliation under the first step of the *McDonnell Douglas* framework, a plaintiff must show: "(1) protected employee activity; (2) adverse action by the employer after or

contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." *Jones v. Se. Pa. Transp. Auth.*, 796 F.3d 323, 329 (3d Cir. 2015). Unlike with the plaintiff's discrimination claim, however, the plaintiff has failed to establish a prima facie case of retaliation to preclude the granting of summary judgment.

The plaintiff argues that Geisinger retaliated against her when she requested accommodations for her disability. Under the first element, a request for an accommodation for a disability is a protected activity for purposes of a claim under the ADA. *See Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 190–191 (3d Cir. 2003); *Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 288 (3d Cir. 2001). But we note that whether the plaintiff requested an accommodation for her disability is convoluted. The plaintiff has alleged in passing two accommodations in her own "Statement of Facts" that are neither substantiated by the record nor advanced in any of her briefs. *See* (Doc. 28-1, ¶ 31) (alleging that she asked for an additional case manager at her clinic and asked not to be moved to a different office). But "unsupported allegations in … memorand[a] and pleadings are insufficient to repel summary

judgment." *Schoch v. First Fidelity Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990); *see also Longstreet v. Holy Spirit Hosp.*, 67 F. App'x 123, 126 (3d Cir. 2003) (finding that a non-moving party cannot rely on "unsupported assertions, speculation, or conclusory allegations" to defeat a summary judgment motion). The plaintiff has therefore failed to substantiate these allegations of a protected activity at the summary judgment stage. Moreover, the plaintiff alleges that she requested that her Special Needs Program assessments, ones that required the most amount of time, be moved over to the dedicated Special Needs Program team. *See* (Doc. 28-1, ¶¶ 26, 27, 28) ("[Geisinger] has an SNP team that is dedicated to just doing SNP comprehensive annual assessments" and "Plaintiff asked Mr. Augustine '[f]or the assessments that were due to be put on the SNP team so that there wouldn't be a chance of them being late.'"). But contrary to this assertion, the plaintiff also conversely admits that she never reached out to Mr. Augustine or anyone on the Geisinger team to ask for help regarding her missed Special Needs Program assessments. (Doc. 29, ¶ 89). It is unclear whether the plaintiff asked for accommodations concerning her Special Needs Program assessments. We find that this uncertainty alone regarding the plaintiff's alleged actions

casts grave doubt on the plaintiff's retaliation claim and provides a sufficient basis for granting Geisinger's motion for summary judgment.

Nonetheless, even if we view the record in light most favorable to the plaintiff and find that there remains a genuine dispute of material fact as to this prong preventing summary judgment, the plaintiff has also failed to prove a causal connection between her ask of accommodations concerning the Special Needs Program assessments and her subsequent termination. Again, "[t]here are two ways to establish a causal connection under the ADA: (1) where the temporal proximity of the alleged disability and the adverse employment action are 'unduly suggestive,' no other evidence is required; or (2) where the timing is not 'unusually suggestive,' but there is other evidence of discrimination or a 'pattern of antagonism.'" *Quick*, 2020 WL 532343, at *17. The plaintiff fails to identify any evidence of a pattern of antagonism stemming from her ask of accommodations concerning her Special Needs Program assessments. Therefore, the plaintiff's retaliation claim relies upon the temporal proximity of her protected activity and her termination as "unduly suggestive."

The Third Circuit has held that "[a]lthough there is no bright line

rule as to what constitutes unduly suggestive temporal proximity, a gap of three months between the protected activity and the adverse action, without more, cannot create an inference of causation and defeat summary judgment." *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 233 (3d Cir. 2007) (citing *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)). Here, in light of that foundation, no reasonable factfinder could find that the temporal proximity between the plaintiff's protected activity and her termination are "unduly suggestive." The plaintiff states that she made her request for accommodations "within the spring to summer of 2021." (Doc. 28-1, ¶ 29). But the plaintiff was not terminated until January 6, 2023. (Doc. 26, ¶ 184). Therefore, at a minimum, a gap of eighteen months existed between the protected activity and the adverse action. This temporal proximity, without more, cannot create an inference of causation, and as we noted above, the plaintiff has failed to identify any potentially discriminatory actions suggesting a causal connection between her accommodations request and her firing. Therefore, the plaintiff's failure to demonstrate a casual connection between her ask for accommodations and her termination additionally prove a sufficient basis to grant Geisinger's motion for

summary judgment on this claim. We need not analyze the third step of *McDonell Douglas* to determine pretext.

### C. Plaintiff's Failure to Accommodate Claims

A plaintiff bringing a failure-to-accommodate claim must establish: "(1) he was disabled and his employer knew it; (2) he requested an accommodation or assistance; (3) his employer did not make a good faith effort to assist; and (4) he could have been reasonably accommodated." *Capps v. Mondelez Glob., LLC*, 847 F.3d 144, 157 (3d Cir. 2017) (quoting *Armstrong v. Burdette Tomlin Mem'l Hosp.*, 438 F.3d 240, 246 (3d Cir. 2006)). Geisinger has moved for summary judgement, arguing that the plaintiff has failed to establish all four elements of her claim.

Upon review of the record, the plaintiff has demonstrated enough evidence to survive the first element of her failure-to-accommodate claim. As we held for the plaintiff's discrimination claim, a genuine dispute of material fact still exists as to whether the plaintiff's ADD diagnosis qualified as a disability and whether the Geisinger regarded her as having such an impairment. But regarding the second element, the plaintiff's request for accommodations is based on the same Special Needs Program assessments as her retaliation claim, and as we noted

before, the plaintiff's convoluted answer as to whether she even asked for assistance for those assessments casts grave doubt on her failure-to-accommodate claim. This uncertainly alone supports the granting of Geisinger's motion for summary judgment.

Nonetheless, even if we view the record in light most favorable to the plaintiff and find that there remains a genuine dispute of material fact as to this prong that prevents summary judgment, we find that no reasonable factfinder could conclude that Geisinger failed to make a good faith effort to assist the plaintiff with her ADD diagnosis. The plaintiff alleges that Geisinger failed to make a good faith effort to accommodate her Special Needs Program assessments and decrease her workload. (Doc. 28, at 18–20). But even if the plaintiff's allegations are true, for which we note that the plaintiff has provided little evidence, the plaintiff's allegations ignore the multitude of accommodations provided by Geisinger in the record before the Court. The plaintiff admits that throughout her employment Geisinger offered her additional time to complete tasks while decreasing her workload and offering her added assistance. (Doc. 26, ¶¶ 82–83, 86, 116–119, 124–126, 160–162, 169–170). The record demonstrates that Mr. Augustine regularly checked in with

the plaintiff about her performance (*id.,* ¶ 111), directed other registered nurses to cover the plaintiff's shifts and daily duties when necessary (*id.,* ¶¶ 169–170), allowed the plaintiff to arrive at work after 9:00 a.m. (*id.,* ¶ 150), permitted the plaintiff to work from home to minimize distractions (*id.,* ¶171), created action plans for the plaintiff when she was struggling (*id.,* ¶ 123), and cancelled training sessions to allow the plaintiff additional time to finish her uncompleted work. (*Id.,* ¶ 160). All of these actions, among other accommodations, constitute "reasonable efforts to assist the employee and communicate with the employee in good faith." *Mengine v. Runyon*, 114 F.3d 415, 416 (3d Cir. 1997). No reasonable factfinder could conclude otherwise. Therefore, because the plaintiff has failed to identify sufficient evidence to support her failure-to-accommodate claim, Geisinger's motion for summary judgment will be granted as to this claim.

## IV.    Conclusion

For the foregoing reasons, Geisinger's motion for summary judgment will be granted in part and denied in part. Geisinger's motion for summary judgment will be granted concerning the plaintiff's retaliation and failure-to-accommodate claims. Geisinger's motion for

summary judgment will be denied as to the plaintiff's discrimination claim.

An appropriate order follows.

Dated: February 9, 2026                    *s/Joseph F. Saporito, Jr.*
                                           JOSEPH F. SAPORITO, JR.
                                           United States District Judge